UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MARY THAYER,                          )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )   2: 09-cv-00435-DBH
                                      )
MARK DION, et al,                     )
                                      )
          Defendants                  )


**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

On September 10, 2007, Mary Thayer was arrested on a domestic violence charge and

detained at the Cumberland County Jail.  After a series of contretemps between Thayer and three

jail officers over the course of several hours, Thayer wound up with a broken right arm requiring

immediate medical attention, transport to the hospital, and, in due course, surgery.  The actual

physical injury was a consequence of efforts involving three officers to place her in a special

holding cell, a maneuver that they insist was necessary due to what they characterize as her

recurring disruptive behavior.  Thayer does not attempt to paint herself as a docile and fully

cooperative detainee during this period; she acknowledges that she verbally challenged

correctional staff over their treatment of her, highlighting a series of alleged provocative and

intimidating utterances by defendants including some racially charged indirect threats.  Part of

this interaction revolved around Thayer's desire to place a phone call and the officers' refusal to

allow her to do so.

Thayer has brought a civil rights action in this court with pendant state law claims.  In

addition to the three officers sued for their direct personal involvement, Thayer has sued the

Cumberland County Sheriff and Cumberland County on theories of failure to train and an

unconstitutional custom of tolerating unconstitutional force during intake to the jail.[1]  I now

recommend that the Court deny summary judgment on Thayer's federal and state claims against

Defendants Pickreign and Barter and grant the motion as it pertains to all claims against

McCarty, Sheriff Dion, and Cumberland County.

## DISCUSSION

## I.    Summary Judgment Standard

Summary judgment -- or 'judgment without a trial'[2] -- is condoned when "the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no genuine

---

[1]      In her complaint Thayer also alleges facts surrounding her post-injury treatment at the jail.  She alleges that she was transported to the hospital in a vehicle operated by the Cumberland County Jail (which was ill-equipped for medical emergencies) and that the jail staff refused to assist her into the vehicle, thereby exacerbating her pain. (Compl. ¶¶ 21, 22, 23.)  After she was returned to the Cumberland County Jail on September 11, 2007, she was held in the medical unit where she was systematically denied her medication and was threatened with placement on a suicide watch if she did not remain quiet.  (Id. ¶¶ 25, 26, 27.) S he was placed in a maximum security unit, allegedly as a form of punishment, and was forcefully searched three times while still suffering from "grievous injury" until her bail hearing a day later on September 12, 2007.  (Id. ¶¶ 28, 29, 30, 31.)  She also clarifies that as a consequence of a pre-existing medical condition she was unable to have the fracture operated on until October 2, 2007, (id. ¶ 33), the implication being that during her post-injury confinement she was in a pre-surgery state of pain and fragility.

Thayer has not pled an Eighth Amendment denial of adequate medical treatment claim, see Farmer v. Brennan, 511 U.S. 825 (1994), and she has not identified (let alone sued) any individuals responsible for the wrongs attributed to these post-injury allegations.  In addition, Thayer has not converted these allegations into summary judgment facts in support of her claims against Sheriff Dion and Cumberland County apropos responsibility for assuring a facility climate respectful of constitutional guarantees.

[2]      D.  Brock Hornby, Summary Judgment without Illusions, 13 GREEN BAG 2d 273, 274 (2010) ("In truth, summary judgment is judgment without trial, a critical event in the course of federal civil justice.  Determining whether that resolution of a lawsuit is appropriate demands substantial time, attention and visibility from experienced lawyers and judges -- without complaint or apology.").

Drawing on this article, Chief District Court Judge Pratt in the Southern District of Iowa has reflected on the 'misnomer' of this stage of federal litigation as 'summary' in decisions in several cases.  For instance, in Ryko Mfg. Co. v. Nationwide Wash Systems, Inc., the following analysis was proffered:

> The term "summary judgment" is something of a misnomer. See D. Brock Hornby, Summary Judgment Without Illusions, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive. Id. at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." Id. at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. Id. at 281-82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."  Id. at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." Id. at 287.

> Federal Rule of Civil Procedure 56(b) provides that "[a] party against whom relief is sought may move at any time ... for summary judgment on all or part of the claim." "[S]ummary

issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c)(2).  I draw all reasonable inferences in Thayer's favor and must discern

whether there is a 'genuine' dispute of fact material to her claims; calls by nonmovants for

unreasonable inferences and mundane disputes of immaterial facts are not a sufficient basis upon

which to deny summary judgment.  See  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); Barr v. Galvin, __ F.3d __, __, 2010 WL 4608755, 6 (1st Cir. Nov. 16, 2010).  This is a

case in which video footage of some of the interactions between Thayer and the officers is part

of the summary judgment mix.  See Scott v. Harris, 550 U.S. 372, 378-80 & ns. 6&7 (2007).

---

judgment is an extreme remedy, and one which is not to be granted unless the movant has
established his right to a judgment with such clarity as to leave no room for controversy and that
the other party is not entitled to recover under any discernible circumstances." Robert Johnson
Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 209 (8th Cir.1976) (citing Windsor v.
Bethesda Gen. Hosp., 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of summary judgment
is not "to cut litigants off from their right of trial by jury if they really have issues to try." Poller v.
Columbia Broad. Sys., Inc., 368 U.S. 464, 467 (1962) (quoting Sartor v. Ark. Natural Gas Corp.,
321 U.S. 620, 627 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming
trials where there is actually no genuine, factual issue remaining to be tried." Anderson v. Viking
Pump Div., Houdaille Indus., Inc., 545 F.2d 1127, 1129 (8th Cir.1976) (citing Lyons v. Bd. of
Educ., 523 F.2d 340, 347 (8th Cir.1975)).
    ....
    Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's
role in deciding the motion is not to sift through the evidence, pondering the nuances and
inconsistencies, and decide whom to believe." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920
(7th Cir.1994). In a motion for summary judgment, the job of a court is only to decide, based on
the evidentiary record that accompanies the moving and resistance filings of the parties, whether
there really is any material dispute of fact that still requires a trial. See id. (citing Anderson, 477
U.S. at 249 and 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice &
Procedure § 2712 (3d ed. 1998)). It is the responsibility of the parties to provide the evidence
necessary for this assessment. Id. at 921.

Ryko Mfg. Co. v. Nationwide Wash Systems, Inc., __ F. Supp. 2d. __, __, 2010  WL 3504124, 3 -4
 (S.D.Iowa  2010).
    As becomes obvious below, this is a suit that, as against two of the five defendants, trial is warranted
(assuming there is no intervening settlement) and as to three of the five defendants judgment without a trial
is appropriate.

## II.    Facts

### A.    *The events of September 10 and 11, 2007*

Thayer was arrested by the Portland Police on a domestic violence charge during the evening on September 10, 2007.  (SMF ¶ 11; Resp. SMF ¶ 11.)  Thayer concedes that if she was arrested this would have been a violation of bail conditions.  (SMF ¶ 12; Resp. SMF ¶ 12; Thayer Dep. at 61.)  She was brought to the Cumberland County Jail in a cruiser by an officer from the Portland Police Department.  (SMF ¶ 13; Resp. SMF ¶ 13; Thayer Dep. at 114.)  In the jail she was pat searched, finger printed, photographed, and told to sit in the waiting room. (SMF ¶ 14; Resp. SMF ¶ 14.)

When Thayer arrived at the jail she was crying and distraught.  (SAMF ¶ 1; Resp. SAMF ¶ 1; SMF ¶ 15; Resp. SMF ¶ 15.)  An intake officer ordered Thayer to stop crying.  (SAMF ¶ 2; Resp. SAMF ¶ 2.)  That intake officer told Thayer:  "There is no crying in jail."  (SAMF ¶ 3; Resp. SAMF ¶ 3.)  Thayer responded, "it's a free country," and continued to cry.  (SAMF ¶ 4; Resp. SAMF ¶ 4.)  The officer in intake responded by saying something to the effect of "if you want to be a smart ass I can put you in a cell."  (SAMF ¶ 5; Resp. SAMF ¶ 5.)

Thayer was then moved to a cell numbered 223.  (SAMF ¶ 6; Resp. SAMF ¶ 6; SMF ¶ 15; Resp. SMF ¶ 15.)  While inside Cell 223, Thayer continued to cry and was screaming and banging her head against the wall.  (SAMF ¶ 7; Resp. SAMF ¶ 7; SMF ¶ 16; Resp. SMF ¶ 16.)  Thayer reports that she was probably told to stop screaming, but she did not.  (SMF ¶ 17; Resp. SMF ¶ 17; Thayer  Dep. at 122-24.)

At  8:55 p.m. Thayer was moved to Cell 229.  (SAMF ¶ 8; Resp. SAMF ¶ 8; Resp. SMF ¶ 17.)  This cell -- the detoxification cell, or "detox" cell -- is designed for intoxicated persons.  It is separated from the booking/intake area by two doors.  This provides a better sound barrier for

vocal and disruptive inmates. (SMF ¶ 18; Breton Aff. ¶ 5; Resp. SMF ¶ 18.)[3] The detox cell is a

"stripped cell" with no fixtures or furniture. (SAMF ¶ 9; Resp. SAMF ¶ 9.) It has a drain in the

floor and a water hose. (SAMF ¶ 10; Resp. SAMF ¶ 10.)

Defendants Barter and Pickreign were not on duty when Thayer arrived at the jail and

Barter, Pickreign, and McCarty were not involved in placing her in the holding cell the first time

or moving her to the detoxification cell the first time. ( SMF ¶ 19; Resp. SMF ¶ 19.)

Thayer was initially in the detox cell for nearly three hours, from approximately 9:00

p.m. until 11:53 p.m. (SAMF ¶ 11; Resp. SAMF ¶ 11; Resp. SMF ¶ 20.) From 9:00 until

approximately 9:30, Thayer was screaming and banging. (SAMF ¶ 12; Resp. SAMF ¶ 12.)

From 9:30 p.m. until 11:53 p.m., Thayer was either sitting on the floor or sleeping (SAMF ¶ 13)

but the log also indicates that at 11:30 p.m. she was standing (Resp. SAMF ¶ 13; Defs.' Ex. 4).

At approximately 11:53, Pickreign came to the cell door and asked if she wanted to get

out of the detoxification cell and go into another cell. (SMF ¶¶ 20, 21; Resp. SMF ¶¶ 20, 21.)

Pickreign initiated a behavior contract with Thayer in which Pickreign agreed to move Thayer to

another cell and permit her to make a phone call if Thayer agreed to remain quiet and compliant.

(SAMF ¶ 14; Resp. SAMF ¶ 14; Resp. SMF ¶¶ 20, 21.) At approximately 11:53, Pickreign

escorted Thayer to Cell 225. (SAMF ¶ 15; Resp. SAMF ¶ 15.) As he was escorting Thayer to

this cell, Pickreign did not place Thayer in a compliance hold or put his hands on her. (SAMF ¶

16; Resp. SAMF ¶ 16.)

Thayer remained in Cell 225 from 11:53 p.m. on September 10 until approximately 1:50

a.m. on September 11. (SAMF ¶ 17; Resp. SAMF ¶ 17.) Thayer was not permitted to make a

---

[3]    As Thayer points out, it would be improper on this record to draw an inference that she was actually
intoxicated. The move seems to have been because she was "vocal and disruptive."

telephone call during that two hour period. (SAMF ¶ 18; Resp. SAMF ¶ 18.) Thayer was quiet and compliant for nearly two hours. (SAMF ¶ 19; Resp. SAMF ¶ 19.)

However, according to the defendants, she then became disruptive again by banging on the door and yelling. (SMF ¶ 22; Pickreign Dep. at 32-33, 46, 51; Barter Dep. at 44, 46, 47, 65.) Barter asked her to be quiet and to calm down more than once. (SMF ¶ 23; Barter Dep. at 47, 48.) When she did not quiet down he went over to her cell to move her back to the detox cell. (SMF ¶ 24; Barter Dep. at 48.)

According to Thayer, after two hours in this cell without being allowed to make a telephone call, she began to protest. (Resp. SMF ¶ 22; Thayer Dep. at 127-28.) When she asked to make her phone call, Barter and Pickreign retorted by saying something to the effect of "we are not running a hotel, you can't just order up what you want." (SAMF ¶ 20; Thayer Dep. 127:9-128:15; Resp. SMF ¶¶ 22, 23.) When Thayer protested, Barter and Pickreign told Thayer she was "lucky" she was not in prison in Iraq "where she could really be tortured, sodomized, and raped like the rest of the rag heads and niggers." (SAMF ¶ 21; Thayer Dep. 127:9-128:25; Resp. SMF ¶¶ 22, 23.) Thayer further protested -- "started screaming"-- by responding that they were "racist pigs." (SAMF ¶ 22; Defs.' Ex D; id. Ex. H at 4; Resp. SMF ¶ 22.)

According to the defendants, neither Barter nor Pickreign said anything to the effect that they were not running a hotel and that Thayer could not just order up what she wants (Resp. SAMF ¶ 20; Barter Nov. 9, 2010, Aff. ¶ 2; Pickreign Nov. 9, 2010, Aff. ¶ 2), and neither told her that she was lucky she was not in Iraq where she could really be tortured, sodomized, and raped like the rest of the rag heads and niggers (Resp. SAMF ¶ 21; Barter Nov. 9, 2010, Aff. ¶ 3; Pickreign Nov. 9, 2010, Aff. ¶ 3). They admit that Thayer called the guards racist pigs, but

deny that this was in response to the guards' remarks. (Resp. SAMF ¶ 22; Barter Aff. ¶¶ 2, 3; Pickreign Aff. ¶¶ 2, 3.)

There is no dispute that Barter then rose from his chair and began to approach Thayer from around the guard desk. (SAMF ¶ 23; Resp. SAMF ¶ 23.) Barter retrieved a pair of black leather gloves and put them on. (SAMF ¶ 24; Resp. SAMF ¶ 24; Resp. SMF ¶ 24.)[4]

The defendants do dispute Thayer's assertion that Barter responded to Thayer's "racist pig" comment by saying that he was "thin-skinned" and was offended by Thayer's comment. (SAMF ¶ 25;Pl.'s Ex. H at 4; Thayer Dep. at 134.) According to the defendants, Barter insists that he did not say that he was "'thick-skinned'" and Pickreign did not hear him say that. (Resp. SAMF ¶ 25; Deny. Barter Aff. ¶ 4; Pickreign Aff. ¶ 4)(emphasis added). According to McCarty, "Thayer was speaking disrespectfully to Dep. Barter," and Barter "ordered Thayer to go with him to Detox Cell F229." (SAMF ¶ 26; Resp. SAMF ¶ 26.) There is also a dispute over whether or not Barter told Thayer that he would "show [her] what happens to people that talk back in jail." (SAMF ¶ 27; Thayer Dep. at 134:4-:6; Resp. SAMF ¶ 27; Barter Aff. ¶ 5; Pickreign Aff. ¶ 5; Resp. SMF ¶¶ 24, 28.)

Barter spent approximately thirty-five seconds outside Thayer's cell before he entered. (SAMF ¶ 28; Resp. SAMF ¶ 28; Resp. SMF ¶ 28 .) Thayer does not know where McCarty was at this point. (SMF ¶ 25; Resp. SMF ¶ 25.) It seems that McCarty was on break and returning from the restroom when Barter approached Thayer's cell. (SMF ¶ 26; Resp. SMF ¶ 26;

---

[4]    There is no explanation in this record as to why Barter needed to put a pair of black gloves on to go and speak with Thayer; the defendants do not suggest that at this point Barter knew he was going to have any physical contact with Thayer. What is more, neither one of the other two responding officers donned gloves when they moved to assist Barter at a time and in a situation where the need for contact was more demonstrable. I admit to a little concerned perplexity over this black glove business but assure the defendants that this fact does not tip my recommendation in Thayer's favor. If this recommendation is adopted and the case does progress to trial, this black-glove approach to Thayer's verbal outburst would be something for the jury to mull in making its determination of whether or not the force applied to Thayer was for the purpose of punishment.

McCarty Dep. at 19-20.) When McCarty came back from break he saw Barter approaching Thayer. (SMF ¶ 27; Resp. SMF ¶ 27.)

Barter opened the cell door and ordered Thayer to come with him. (SAMF ¶ 29; Resp. SAMF ¶ 29; SMF ¶ 28.) Thayer backed into the cell and sat down on the bed and refused to get up. (SAMF ¶ 30; Resp. SAMF ¶ 30; SMF ¶ 28; Resp. SMF ¶ 28.) Thayer reports that she was afraid of Barter because he had just threatened her. (SAMF ¶ 31; Thayer Dep. at 142:7-:9; Resp. SMF ¶ 28.) The defendants respond that they do not know what Thayer's state of mind was, but deny that Barter had just threatened her. (Resp. SAMF ¶ 31; Barter Aff. ¶ 5; Pickreign Aff. ¶ 5.) Barter grabbed Thayer's arm and attempted to pull her off the bed. (SAMF ¶ 32; Resp. SAMF ¶ 32; SMF ¶ 29; Resp. SMF ¶ 29.) When Barter grabbed her arm, Thayer told him to leave her alone. (SAMF ¶ 33; Resp. SAMF ¶ 33; Resp. SMF ¶ 29.)

It is Thayer's contention that when Barter was unable to remove Thayer from the bed, he called her "fat." (SAMF ¶ 34; Thayer Dep. at 135:18-:21; Resp. SMF ¶ 29.) Barter denies making this comment and Pickreign denies hearing him utter it. (Resp. SAMF 34; Barter Aff. ¶ 6; Pickreign Aff. ¶ 6.) Thayer maintains that Pickreign and McCarty joined Barter in the cell. (SAMF ¶ 35; Thayer Dep. at 135:18-:21; McCarty Dep. at 12:4-:12.) She states that all three grabbed Thayer's arms and began pulling her off of the bed. (SAMF ¶ 36; Pl.'s Ex. E; McCarty Dep. at 12:4-12.)

The defendants explain the response of the other officers as follows. When Barter went over to the cell, Pickreign looked on the computer and it said that Thayer was a two unit call meaning that two officers were required to manage her. (SMF ¶ 30; Pickreign Dep. at 47, 56;

McCarty Dep. at 21.)[5] Because the officers were aware this was a two unit call, this heightened McCarty's and Pickreign's awareness that her potential for violence was greater than the average inmate. (SMF ¶ 31; Pickreign Dep. at 48; McCarty Dep. at 21-22; Resp. SMF ¶ 31.) This made these two officers more cautious in dealing with Thayer (SMF ¶ 32; Pickreign Dep. at 48; McCarty Dep. at 21-22; Resp. SMF ¶ 32) and contributed to McCarty's decision to assist Barter and Pickreign (SMF ¶ 33; McCarty Dep. at 19-21; Resp. SMF ¶ 33).

The defendants admit that McCarty joined Barter in the cell, but assert that Pickreign was not in the cell but right outside the cell door. (Resp. SAMF ¶ 35; Pickreign Dep. at 38-39; Pl.'s Ex. B at 1:43-1:47.) They admit that McCarty and Barter grabbed Thayer's arms and began pulling her off the bed but deny that all three grabbed Thayer's arms at the same time, while conceding that Pickreign was involved in pulling Thayer off her bed. (Resp. SAMF ¶ 36; Pickreign Dep. at 38-39; McCarty Dep. at 12-13; Pl.'s Ex. B at 1:43-1:47.) There is agreement that, having removed Thayer from the bed, Barter and Pickreign began pushing and pulling Thayer out of the cell. (SAMF ¶ 37; Resp. SAMF ¶ 37.)

Thayer represents that, once out of the cell, Thayer stopped resisting Pickreign and Barter. (SAMF ¶ 38; Thayer Dep. at 136; Resp. SMF ¶ 36.) Nevertheless, Pickreign and Barter "slammed" Thayer up against a desk in the lobby of the intake area. (SAMF ¶ 39; Pl.'s Ex. B at 1:46-01:55.) After she was slammed up against the desk, Barter placed Thayer's left arm in a "rear arm bar" hold (SAMF ¶¶ 40, 43; Leach Dep. at Ex. at 7-8) and Pickreign placed Thayer's right arm in a "rear arm bar" hold (SAMF ¶ 41; Pickreign Dep. at 39:17-40:12). A "rear arm bar" hold is a maneuver where an officer controls an inmate's arm behind the inmate's back and

---

[5]    Thayer objects to the reliance on what Pickreign found out through the computer on hearsay grounds but concedes that Pickreign so testified. (Resp. SMF ¶ 30.) She also denies any suggestion that she was in fact properly designated as a two-unit call. (Resp. SMF ¶ 30; 31.)

uses leverage in order to prevent the inmate from pulling back against the officer and being able to free their arm. (SAMF ¶ 42; Pickreign Dep. at 40:18-:20; Pl.'s Ex. G.) The "double arm bar" maneuver used by Barter and Pickreign is not one that is taught by the Cumberland County Jail (SAMF ¶ 44; Pl.'s Ex. F; Resp. SMF ¶ 37) and the maneuver used by Barter and Pickreign increased the likelihood that Thayer would be injured (SAMF ¶ 45; Pl.'s Ex. F).

For their part, the defendants maintain that as Thayer was being taken out of the cell she grabbed onto the door frame (SMF ¶ 34; Resp. SAMF ¶ 38; Thayer Dep. at 136, 141-142), a representation that Thayer concedes (Resp. SMF ¶ 34). According to Pickreign, he grabbed Thayer's right arm with both hands as she was blocking the doorway. (SMF ¶ 35; Pickreign Dep. at 38-39.)[6] The defendants also admit that Thayer was placed up against the desk. (Resp. SAMF ¶ 39; Pickreign Dep. at 39-40; McCarty Dep. at 15) but deny that the term 'slammed' accurately describes their conduct (Resp. SAMF ¶¶ 39, 40, 43; Pickreign Dep. at 39-40; McCarty Dep. at 15). According to the defendants, Barter and Pickreign pushed her against the officers' desk because Barter was losing his grip and he needed to readjust his hold on her. (SMF ¶ 36; Barter Dep. at 50.) While Thayer was up against the desk, Barter placed Thayer's left arm in a compliance hold. (Resp. SAMF ¶ 40;Pickreign Dep. at 38-39; Thayer Dep. at 145-146.) The defendants also repeatedly insist that the terminology used to describe this compliance hold is unclear and that different terms have been used to describe the actual hold used. (Resp. SAMF ¶¶ 40, 41, 42, 43, 44, 45,46, 52, 61; Leach Dep. at 50-51.) They allow as that while Thayer was up against the desk, Pickreign placed Thayer's right arm in a compliance hold (Resp. SAMF ¶ 41; Pickreign Dep. at 39; Thayer Dep. at 144-145) and admit that Pickreign described

---

[6]      Thayer attempts to qualify this by citing testimony of McCarty that Pickreign had grabbed Thayer's right arm with both hands while inside her cell in assisting pulling her off the bed, all of which preceded her grabbing of the doorframe. (Resp. SMF ¶ 35; McCarty Dep. at 12:4-8.)

the rear arm bar in this way (Resp. SAMF ¶ 42).  They also concede that while Thayer was up against the desk, Barter placed Thayer's left arm in a compliance hold.  (Resp. SAMF ¶ 43; Pickreign Dep. at 38-39; Thayer Dep. at 145-46.)  The defendants assert that the term "double arm bar" as used in the memo cited by Thayer describes two separate arm bars used by Barter and Pickreign and was not a distinct maneuver called the "double arm bar."  (Resp. SAMF ¶ ¶ 44, 45, 46; Pl.'s Ex. F.)  The Internal Affairs memo relied on by Thayer states that "the combination of the compliance holds used by Barter and Pickreign may have contributed to the injury since there was pressure or force being applied by separate individuals at differing levels thus increasing the likelihood of injury."  (Resp. SAMF ¶ 45; Pl.'s Ex. F ) (emphasis added).

Thayer insists that prior to and after placing Thayer in a double arm bar hold Thayer was not physically resisting them (SAMF ¶ 46; Pl.'s Ex. B at 1:46-1:55; Pickreign Dep. at 43:10-:12 & 53-54) and  Barter, Pickreign, and McCarty then forcefully escorted Thayer to Room 229. (SAMF ¶ 47; Pl.'s Ex. B at 1:55).  The defendants deny these characterizations indicating that Thayer physically resisted getting off her bed and being removed from her cell. (Resp. SAMF ¶ 46; Thayer Dep. at 136, 141-142; Barter Dep. at 4.)  They argue that the video footage does not support Thayer's assertion that McCarty forcefully escorted her as he walked behind the trio. (Resp. SAMF ¶ 47;  Pl.'s Ex B at  1:50-2:00; McCarty Dep. at 23.)[7]

Barter had a compliance hold on Thayer's left arm and Pickreign had a compliance hold on Thayer's right arm as they walked to the detox cell.  (SMF ¶ 37; Thayer Dep. at 145-46; Pickreign Dep. at. 38-39; SAMF ¶ 52; Resp. SAMF ¶ 52.)  McCarty followed behind Thayer as she was escorted to the detox cell.  (SMF ¶ 38; McCarty Dep. at  23.) Thayer believes McCarty grabbed the back of her shirt, but she is not sure.  (SMF ¶ 39; Thayer Dep. at 138, 139; Resp.

---

[7]        This portion of the response is framed as a request to strike.

SMF ¶ 39.)[8]  The defendants also object to the use of the term 'forceful' although they admit that

Barter and Pickreign used compliance holds during the escort.  (Resp. SAMF ¶ 47; Thayer Dep.

at 145-146; Pickreign Dep. at 38-39.)  After the defendants were able to put Thayer into

compliance holds she was walking compliant, but she was still very verbally aggressive. (Resp.

SAMF ¶ 38; Pickreign Dep. at  43.)

In another "she says" "they say" dispute, Thayer reports that she told the officers that

they were hurting her and Pickreign responded by saying "it's supposed to hurt." (SAMF ¶¶ 39,

40; Thayer Dep. at 139.)  Pickreign and Barter insist that Thayer never indicated she was being

hurt and Pickreign did not tell her it was supposed to hurt.  (Resp. SAMF ¶¶ 39, 40; Pickreign

Aff. ¶¶ 7, 8; Barter Aff. ¶ 7.)  While the parties agree that Thayer asked the officers what they

were going to do to her (SAMF ¶ 50; Resp. SAMF ¶ 50), Thayer indicates that the officers

responded by telling her that they were going to strip her naked and hose her down with water

and the officers flatly deny that either of them said this (SAMF ¶ 51, Resp. SAMF ¶ 51;

Pickreign Aff. 9; Barter Aff. ¶ 8.)

1.      *The Injury*

One key area of factual dispute plays out, in the summary judgment context, as follows.

The door to the detox cell, Cell 229, was opened and Thayer was brought into the detox cell --

Thayer describes being pushed -- and being ordered to kneel down.  (SMF ¶ 40; Resp. SMF ¶ 40;

SAMF ¶ 53; Resp. SAMF ¶ 53; Resp. SMF ¶ 41.)  According to the defendants, Thayer was

ordered to kneel because it gives a better reaction time to allow the officers to exit the cell.

(SMF ¶ 41; Pickreign Dep. at 42; Leach Dep. at 53.) Thayer responds by pointing out that the

---

[8]      Thayer stresses that this is not her only allegation of involvement by McCarty.  (Resp. SMF ¶ 39; McCarty
Dep. at 12:4-12.)

cited portion of Pickreign's deposition testimony related that he could not identify a jail policy that requires inmates to kneel under these circumstances. (Resp. SMF ¶ 41.)

The defendants insist that Thayer did not comply with the order to kneel. (SMF ¶ 42; Pickreign Dep. at 54; McCarty Dep. at 27.) Per Thayer, she complied with their order and began to kneel. (SAMF ¶ 54; Thayer Dep. at 139:19-:25, 140:5-:9.) Thayer testified at her deposition,

> and at the door, they said kneel down, so they're all three of them pushing on me and I was moving and I knelt down, and when I knelt down, Pickreign pulled up like this (indicating) and the other guy went forward over my head and put his hand on the cement wall.

(Thayer Dep. at 139; Resp. SMF ¶ 42.) Thayer outright insists that she did not disobey an order to kneel (Thayer Dep. at 140; Resp. SMF ¶ 42) and that, despite her compliance, Barter, McCarty, and Pickreign pushed Thayer to the floor. (SAMF ¶ 55; Thayer Dep. at 139-140:9.) The defendants admit that Thayer leaned forward at the same time Barter started pushing her forward and downward and that she collapsed like a dead weight. (Resp. SAMF ¶¶ 54, 55; Pickreign Dep. at 63; Barter Dep. at 60-61; SMF ¶ 43.) They deny that Thayer complied immediately and posit that Barter and Pickreign did not know that she was beginning to kneel, if she was. (Resp. SAMF ¶¶ 54, 55; Pickreign Aff. ¶¶ 10,12; Barter Aff. ¶¶ 9-11.) The defendants insist that neither Pickreign nor McCarty pushed Thayer to the floor. (Resp. SAMF ¶¶ 55, 61; Pickreign Aff. ¶ 13; Thayer Dep. at 138, 139; Barter Aff. ¶ 12.) According to Thayer it was Barter and Pickreign who began pushing her to the floor while Pickreign pulled up on her arm. (Resp. SMF ¶ 43; Thayer Dep. at 139; Pickreign Dep. at 41.) Barter fell to the floor with Thayer. (SMF ¶ 44; Resp. SMF ¶ 44.)

The defendants describe Barter and Pickreign as not having coordinated their actions. (SMF ¶ 45; Barter Dep. at 62; McCarty Dep. at 28.) Thayer responds that the fact that Barter and Pickreign both had holds on Thayer's arms, walked her cooperatively to the detox cell, and

were simultaneously engaged in forcing her to the floor, there was certainly some degree of "coordination" over the course of this encounter. (Resp. SMF ¶ 45.) She concedes that Pickreign and Barter did not have a verbal conversation about who was pushing or pulling Thayer as she was forced to the ground. (Resp. SMF ¶ 45; Barter Dep. at 62.) There is no dispute that Thayer was not warned that she was going to be pushed to the floor. (SAMF ¶ 56; Resp. SAMF ¶ 56.)

According to the policies of the Cumberland County Jail relating to the use of force, "employees may employ needed and reasonable physical control in accordance with Title 17A (holding, pulling, pushing, throwing or exert greater strength to overcome resistance in order to defend themselves or another person or to subdue a resisting subject)" (SAMF ¶ 57; Resp. SAMF ¶ 57) and the question of "whether the control was applied in a good faith effort to maintain and restore order or maliciously for the purpose of causing harm" is a factor to be considered when determining whether force employed by an officer is excessive. (SAMF ¶ 58; Resp. SAMF ¶ 58.) Per this policy, "the use of physical force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority." (SAMF ¶ 59; Resp. SAMF ¶ 59.) None of the officers explained to Thayer how she should kneel while her arms were being restrained behind her back. (SAMF ¶ 60; Resp. SAMF ¶ 60.)

While she was being pushed to the floor, Barter and Pickreign continued to restrain her arms behind her. (SAMF ¶ 61; Resp. SAMF ¶ 61; Pickreign Dep. at 41, 53:23-54:12; Leach Dep. Ex. 5 at 5-7.) There is no dispute that as she was being pushed to the floor, Thayer's right arm broke. (SAMF ¶ 62; Resp. SAMF ¶ 62; SMF ¶ 46; Resp. SMF ¶ 46.) According to Thayer her arm broke so violently that Pickreign heard the bone snap and felt her arm go limp. (SAMF

¶ 63; Leach Dep. Ex. 5 at 5-7.) The defendants admit that Pickreign heard the bone snap, but deny that the arm broke so violently. Pickreign was holding Thayer's arm, but wasn't putting pressure on it. (Resp. SAMF ¶ 63; Leach Dep. Ex. 5 at 7.)

With Thayer down on the floor, McCarty removed her sandals. (SAMF ¶ 66; Resp. SAMF ¶ 66.) McCarty did not check Thayer's arm. (SAMF ¶ 67; Resp. SAMF ¶ 67.) McCarty was more concerned with following procedure and taking off Thayer's shoes than he was with whether or not Thayer was injured. (SAMF ¶ 68; Resp. SAMF ¶ 68.)[9] After Thayer's arm was broken, Pickreign, Barter, and McCarty walked, in an orderly fashion, nonchalantly, and with no sense of urgency out of the detox cell. (SAMF ¶¶ 70, 71; Resp. SAMF ¶¶ 70, 71; Pickreign Dep. at 60:22-61:23; Pl.'s Ex. A, at 2:19-2:28; id. Ex. B at 2:25- 2:45; McCarty Dep. at 23, 41; Thayer Dep. at 138-139.) The defendants, acknowledging a retreat from the cell with no sense of emergency, assert that within ten to fifteen seconds after leaving the cell Pickreign instructed medical to be called (Resp. SAMF ¶ 71; Pickreign Dep. at 68), adding that less than one and a half minutes after the officers left the cell, medical entered the detox cell occupied by Thayer. (Resp. SAMF ¶ 71; Pl.'s Ex. A at 2:20; 3:40).

There is no genuine dispute as to the following timeframe. Thayer was brought to the detox cell around 1:50 am on September 11, 2007. (SMF ¶ 47; Resp. SMF ¶ 47.) The officers were in the detox cell for approximately sixteen seconds. (SMF ¶ 48; Resp. SMF ¶ 48.) Within ten to fifteen seconds after leaving the cell Pickreign instructed medical to be called. (SMF ¶ 49; Resp. SMF ¶ 49.) A nurse came in with another officer to look at her injury. They said the arm was broken and shortly thereafter she was taken to the hospital around 2:00 to 2:30 a.m. (SMF ¶ 50; Resp. SMF ¶ 50.)

---

[9]      I have stricken Paragraph 69 as it is a misstatement of the deposition testimony relied upon.

Thayer asserts that she suffered a three-part, spiral fracture of her humerus bone of her right arm. The fracture was caused by the exertion of a "reasonably forceful" rotational or torsional movement. (SAMF ¶ 64; Camuso Dep. at 10-13; Resp. SMF ¶ 46.) The defendants retort that Dr. Camuso stated only that it is more likely than not that some sort of torsional or twisting force to the upper arm caused the fracture, but he could not quantify the amount of force used or determine the direction of the force. ( Resp. SAMF ¶ 64; Camuso Dep. at 14.) Camuso says that "I think you have to have a reasonable amount of force for a fracture to occur." (Resp. SAMF ¶ 64; Camuso Dep. at 13.) There is no question that Thayer's injury required significant surgery. (SAMF ¶ 65; Resp. SAMF ¶ 65.)

When formulating his expert opinion in this case, defendants' expert, Mr. Leach, disregarded as "irrelevant" Thayer's version of events, including her report that Barter and Pickreign told her she was lucky she was not a prisoner in Iraq where she could really be tortured like the other "rag heads" and "niggers." (SAMF ¶ 72; Leach Dep. at 20:15- 21:10.) The defendants admit that Mr. Leach disregarded Thayer's statement because it was irrelevant to her beating and banging and kicking on the door and her subsequent behaviors. (Resp. SAMF ¶ 72; Leach Dep. at 21-22.) There is no genuine dispute that Mr. Leach did not believe Thayer's version of events. (SAMF ¶ 73; Resp. SAMF ¶ 73.) Mr. Leach disregarded Thayer's statement that Barter said "I'm thin skinned and take offense to what you just said and I'm going to show you what happens to people that make comments like that in jail." (SAMF ¶ 74; Resp. SAMF ¶ 74.) According to Mr. Leach, it would be reasonable for Thayer to be afraid of Barter when he entered her cell if he had just told her that he was "going to show [her] what happens to people who make comments like that in jail." (SAMF ¶ 75; Resp. SAMF ¶ 75.) Mr. Leach, however, does not "believe that that conversation [between Thayer and Barter] occurred." (SAMF ¶ 76;

Resp. SAMF ¶ 76.)[10]  According to the defendants' own expert, Barter and Pickreign's use of arm bar holds while they moved her to Cell 229 constituted a "use of force" (SAMF ¶ 76; Resp. SAMF ¶ 76), and the use of force on an inmate who is being compliant is excessive.  (SAMF ¶ 77; Resp. SAMF ¶ 77).

**B.**     ***Facts Relevant to Supervisory and Municipal Liability Claims***

 Mark Dion has been the Sheriff of Cumberland County since December 31, 1999.  (SMF ¶ 51; Resp. SMF ¶ 51.)  As Sheriff of Cumberland County, Dion has final decision making authority with respect to all policy and operational matters at the Cumberland County Jail.  (SMF ¶ 52; Resp. SMF ¶ 52.)  The Cumberland County Sheriff's Office Corrections Division Policy and Procedure Manual contains the official policies and procedures of the Cumberland County Jail.  This manual is available for staff to review on the computer.  Dion's staff is required to review and be knowledgeable and conversant with the policies in the manual.  (SMF ¶ 53; Resp. SMF ¶ 53.)  Cumberland County Jail Policy and Procedure D-241 is the official policy and procedure of the Cumberland County Jail regarding the use of force and was in effect on the date of the incident in this lawsuit.  (SMF ¶ 54; Resp. SMF ¶ 54.)

According to the defendants, as of September 2007, Sheriff Dion had not perceived or known that there was any need for additional training of corrections officers on the use of force, primarily because there was no pattern or practice of events that would suggest that additional training was necessary.  (SMF ¶ 55; Dion Aff. ¶ 5.)  Thayer makes the following showing towards countering this assertion.

**1.**     ***The Internal Affairs Investigation Reports***

---

[10]     To state the obvious, this expert would not be able to testify as to the credibility of Thayer respecting her description of what occurred.

Thayer has forwarded several statements of additional fact that rely on internal affairs investigation reports. The defendants have requested that the court strike several of these, predominantly on hearsay grounds. Thayer has not responded to the request to strike in the time permitted by District of Maine Local Rule 56. However, I conclude that for the most part the hearsay related objections are not grounds for disregarding the reports as evidence, not of the truth of the matters asserted/conveyed in the reports, but as evidence of what Sheriff Dion and Cumberland County were told about the investigations.

In an Internal Affairs Investigation Report relating to a separate matter, Lt. Joel E. Barnes of the Cumberland County Sheriff's Department recorded reports that the Intake Department at the Jail is "a part of the jail that operated freely from the supervision of the rest of the jail in just about all aspects, except for if they have an incident taking place and they need immediate assistance." (SAMF ¶ 79; Pl.'s Ex. I at 1-22. ) The defendants admit that the statement cited by Thayer is contained in an Internal Affairs investigation relating to a separate matter from August 2007. This statement was made by a sergeant from the housing division and this investigation concerned an officer who was late for work and then may have been away from his duty post during the day. (Resp. SAMF ¶ 79; Pl.'s Ex. I; Dion Dep. at 50.) Sheriff Dion maintains that he spoke to the jail administrator about this issue. (Resp. SAMF ¶ 79; Dion Dep. at 48.)

On August 4, 2004, an officer in the Jail Intake Department utilized excessive force against an inmate who had called him a "faggot." (SAMF ¶ 80; Pl.'s Ex. J.) The defendants respond that the internal affairs investigation concluded that the officer "over-reacted" to the situation, but did not state in the report that this was excessive force. (Resp. SAMF ¶ 80; Pl.'s Ex. J to 4.) According to the internal affairs investigation of this incident, the intake officer being investigated pushed a physically compliant inmate to the floor and the inmate's feet

disappeared into the cell when the officer walked into the cell, followed by five other officers. According to reports, the inmate was then sprayed in the face with OC spray in an effort to gain compliance with order. (SAMF ¶ 81; Ex. J at 3-4; Resp. SAMF ¶ 81.) According to this report, all six officers entered the cell and this was "too many officers, plus a prisoner in one small cell at one time." (SAMF ¶ 82; Resp. SAMF ¶ 82; Pl.'s Ex. J at 4.) The report noted that three of the officers' reports regarding the August 4, 2004, incident stated that the inmate had threatened an officer. (SAMF ¶ 83; Resp. SAMF ¶ 83.) However, according to the this internal report, "the video simply does not support these statements." (SAMF ¶ 84; Resp. SAMF ¶ 84.) Per the report, it was not clear whether the officer became upset at being called a "faggot" or for some other reason. The report contained the following conclusion: "Verbal communication and de-escalation techniques were more appropriate for the situation reviewed." (SAMF ¶ 85; Resp. SAMF ¶ 85.)

In a letter dated February 23, 2007, Chief Deputy Kevin Joyce notified Lt. Joel Barnes that in the course of a polygraph test taken by a corrections officer, the corrections officer admitted that, on several occasions, he had both witnessed verbal and physical abuse of inmates by corrections officers and had engaged in that behavior himself. (SAMF ¶ 86; Pl.'s Ex. K at 1-2.) In his interview with the internal affairs investigator, the officer stated that he had seen other corrections officers verbally abuse or provoke inmates in order to trigger an altercation. (SAMF ¶ 87; Pl.'s Ex. K at 4-5.) The officer stated that he had seen other corrections officers use excessive force against inmates or force that was disproportionate to what the situation called for. (SAMF ¶ 88; Pl.'s Ex. K at 5.)

The defendants concede that this information was included in a letter dated February 23, 2007, but note that there was no timeframe for when this conduct allegedly occurred and once

the officer was interviewed much of the conduct was not considered to be abuse. (Resp. SAMF ¶ 86; Pl.'s Ex. K.) The defendants admit that this corrections officer stated that he had seen other corrections officers verbally abuse or provoke inmates once or twice, but he said that one of the incidents had happened four years prior and did not give a timeframe for the other incident. (Resp. SAMF ¶ 87; Pl.'s Ex. K.) The corrections officer thought he had seen incidents involving excessive force, although the investigating officer thought some of these incidents were justified. (Resp. SAMF ¶ 88; Ex. K.)

On June 28, 2007, Major Francine Breton requested an internal affairs investigation after she received an anonymous note telling her to review video footage from the intake area of the jail taken on June 25, 2007. (SAMF ¶ 89; Resp. SAMF ¶ 89.) An investigation was undertaken into the possible use of excessive force by an officer in the intake department of the jail on June 25, 2007. (SAMF ¶ 90; Resp. SAMF ¶ 90.) According to the internal affairs report, both McCarty and Barter were present and assisted in moving an inmate to the detox cell on June 25, 2007. (SAMF ¶ 91; Resp. SAMF ¶ 91.) In his report, the investigator notes his concern that McCarty's report of the incident is so similar to the other officers' reports that they could have been written by the same person. (SAMF ¶ 92; Resp. SAMF ¶ 92.) The report ultimately substantiated the allegation that the officer being investigated had used excessive force when he bent an inmate over a counter in the intake section of the jail and "bounce[d] his head off the Plexiglas window two times." (SAMF ¶ 93; Resp. SAMF ¶ 93.) As sheriff, Mark Dion reviews internal affairs reports issued in connection with investigations into corrections offices. (SAMF ¶ 94; Resp. SAMF ¶ 94.)

**2.** *Training*

Joshua Pickreign has been a corrections officer at the Cumberland County Jail since 1998. (SMF ¶ 1; Resp. SMF ¶ 1.) At the time of the events in this case Pickreign was a Sergeant. (SMF ¶ 2; Resp. SMF ¶ 2.) Robert Barter has been a corrections officer at the Cumberland County Jail for approximately ten years. (SMF ¶ 5; Resp. SMF ¶ 5.) Derek McCarty has been a corrections officer at the Cumberland County Jail since January 2004. (SMF ¶ 8; Resp. SMF ¶ 8.)

All three officers' training includes the required basic corrections course which incorporates training on the use of force. (SMF ¶¶ 3, 6, 9; Resp. SMF ¶¶ 3,6,9.) According to the defendants, prior to September 2007, Pickreign had been trained on the use of control, unarmed self-defense, suicide awareness and prevention, mental health issues, and Cumberland County policies and procedures, including D-241 (use of force). (SMF ¶ 4; Pickreign Dep. at 19-22; Pickreign Training Aff. ¶ 3, Defs.' Ex. 1.) According to Thayer, Pickreign testified that he could not recall any specific training he had done over thirteen years on psychological disorders and suicide awareness. (Resp. SMF ¶ 4; Pickreign Dep. at 19:23-20:8.) There is no dispute that, prior to September 2007, Barter and McCarty had been trained on the use of control, unarmed self-defense, suicide awareness and prevention, mental health issues, and Cumberland County policies and procedures, including D-241 (use of force). (SMF ¶¶ 7,10; Resp. SMF ¶¶ 7, 10.)

With respect to the procedures used in this case Donald Leach was designated as an expert by the defendants. (SMF ¶ 56; Resp. SMF ¶ 56; Resp. SMF ¶ 58; Defs.' Ex. 6.) It is the defendants' view, based on his testimony, that having an inmate kneel down when corrections officers are leaving a cell is a protective measure to reduce the possibility of being assaulted. (SMF ¶ 57; Leach Dep. at 53.) The defendants had the right to use force to gain compliance when Thayer refused the order to stand. (SMF ¶ 58; Leach Dep. at 116.) The technique the

officers used to escort Thayer to the detox cell was an appropriate technique. (SMF ¶ 59; Leach Dep. at 121.)

Thayer challenges this sequence of paragraphs with the following assertions. She argues that no foundation has been laid through the cited testimony for the proposition that having an inmate kneel on the floor is a protective measure that is generally recognized or approved either by the Cumberland County Jail or correctional facilities generally. (Resp. SMF ¶ 57.) Whether the officers "had a right" to take particular action constitutes a legal conclusion as to whether the defendants did or did not violate any state or federal laws in their treatment of Thayer. Mr. Leach was not designated to offer such an opinion nor is he qualified to give one. He is similarly not qualified to testify whether the officers' actions were justified under State or Federal law. Those are issues to be decided by this Court. (Resp. SMF ¶ 58.) The characterization of the technique used as "appropriate" is vague and confusing. The cited testimony does not explain whether the technique is purportedly "appropriate" because it complies with Cumberland County Jail policies, legal principles relating to what constitutes excessive force, or is based on some other standard. No foundation or context is laid in the cited testimony for this opinion. In fact, according to Leach, whether a defense tactic is "appropriate" bears no relationship to training or policy. Instead, according to Leach, in the absence of any training "whatever you do is entirely appropriate." (Resp. SMF ¶ 59; Leach Dep. at 122:18-20.) According to Thayer, his statement reveals that Mr. Leach's opinion is not "the product of reliable principles and methods" nor did he apply any principles or methods "reliably to the facts of the case." (Resp. SMF ¶ 59, citing Fed.R. Evid. 702.) Further, Thayer notes that in his report, Chief Deputy Kevin Joyce indicated that the "double-arm bar" maneuver used by Barter and Pickreign is not one that is taught by the Cumberland County Jail and that the technique "may have contributed to the injury since there

was pressure or force being applied by separate individuals at differing levels thus increasing the likelihood of injury" and that Leach testified that the use of any force when an inmate is compliant is excessive. (Id. Pl's Ex. F; Leach Dep. at 41:25-42:1.)

## III. Analysis of Claims

### A. *Liability of the Three Officer Defendants for Unconstitutional Use of Force*

Thayer's claims under the Maine State Constitution and the United States Constitution rise or fall on the same legal standard. See Estate of Bennett v. Wainwright, 548 F.3d 155, 179 (1st Cir. 2008) ("[T]he protections provided by the Maine Civil Rights Act, including immunities, are coextensive with those afforded by 42 U.S.C. § 1983."). The parties both address Thayer's Fourteenth Amendment unconstitutional use of force claim under the Eighth Amendment cruel and unusual punishment rubric, although the applicability of this standard to Thayer's claim concerning events within a handful of hours after her arrest and booking at the jail is not a foregone conclusion. See Whitley v. Albers 475 U.S. 312, 327 (1986) ("Because this case involves prison inmates rather than pretrial detainees or persons enjoying unrestricted liberty we imply nothing as to the proper answer to that question outside the prison security context by holding, as we do, that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause."); but see Hernandez v. Ashe, __ F. Supp. 2d __, 2010 WL 4053920, 4 -5 (D.Mass. Oct. 13, 2010).[11]

According to Judge Hornby's "Pattern Instructions for Cases of Excessive Force in Violation of the Fourth, Eighth and Fourteenth Amendments," vis-à-vis unconstitutional force claims brought by detainees, in order for Thayer to ultimately prove a "claim of

---

[11]   This Court is well aware that "the standard applicable to pretrial detainees' claims for excessive force is an unsettled question of law across the country." Dist. Me. Pattern Jury Inst. 3.1 (Hornby, J.) (updated Oct. 29, 2007) at 15 n. 1 (collecting cases).

unconstitutionally excessive force used to punish," her as a detainee she "must prove by a preponderance of the evidence" that the defendants "intentionally, rather than negligently, used excessive force" and "that the use of excessive force against [Thayer] was for the purpose of punishment." "It is not necessary to find that [the defendants] knew that punishing [Thayer] would deprive [Thayer] of [her] constitutional rights in order to find in favor of [Thayer]. [Thayer] is entitled to relief if [the defendants] intentionally used excessive force for the purpose of punishment against [Thayer]." Dist. Me. Pattern Jury Inst. 3.1 (Hornby, J.) (updated Oct. 29, 2007) at 15 (footnotes omitted). See Harriman v. Hancock County, 1:08-00122-JAW, 2009 WL 902073, 15 -16 & n.19 (D. Me. 2009). Based on the forgoing factual record and the forthcoming analysis, I conclude that my recommendation would be the same even applying the less-plaintiff-favorable Eighth Amendment standard applicable to convicted inmates of "unnecessary and wanton infliction of pain," Whitley, 475 U.S. at 319, with its inquiry as to "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillan, 503 U.S. 1, 6-7 (1992).[12]

### 1. Officers Pickreign and Barker

It seems that the defendants realize that their stiffest challenge in this quest for summary judgment relates to Thayer's description of the conduct of Officers Pickreign and Barter. The

---

[12] Although acquiescing to a straight-up Eighth Amendment standard, Thayer recites the oft-repeated reflection that pre-trial detainees have at least as substantial rights protection as convicted inmates. Potentially advocating for a Fourth Amendment Graham v. Conner, 490 U.S. 386 (1989) force-that-was-unreasonable-under-the-circumstances standard could make or break a detainee's unconstitutional force claim. But at this stage of this proceeding the election of a particular standard is not outcome determinative as there is a sufficiently genuine dispute of fact material to Thayer's claims against Pickreign and Barter to justify a trial on the more onerous Eighth Amendment analysis and McCarty would be entitled to judgment under the more plaintiff-friendly Fourth Amendment standard.

I have framed the analysis through the prism of this Court's pattern instruction because this would presumably be the go-to 'GPS' coordinates at trial and my task at this time is to map whether or not there is a trial-worthy issue here.

facts that support Thayer's case against these two defendants, though in dispute, must be viewed in Thayer's favor at this stage of the litigation.

There is nothing that connects these two defendants with the early admonishment to Thayer that there is no crying in jail and that she would be placed in a cell because she was being a smart ass. Nor were they involved in putting her in a cell (rather than allowing her to be in the waiting area) or moving her to the detoxification cell for the first time. These allegations only help set the scene for the interactions that followed and perhaps support a claim that there is a custom in the jail of treating detainees in such a manner.

So, after her first placement in the detox cell numbered 229, at approximately 11:53 p.m., Pickreign escorted Thayer to Cell 225. As he was escorting Thayer to this cell, Pickreign did not place Thayer in a compliance hold or put his hands on her. Presumably at this juncture Pickreign could have and should have known that Thayer was a 'two unit call' as a consequence of the earlier booking process because of his responsibilities that night.

The defendants did not once permit Thayer a phone call, even though she was quiet for nearly a two hour stretch. According to Thayer, the denial of phone privileges triggered her protest or, as the defendants would characterize it, her disruptive behavior. Although the defendants deny any of the following comments were made by them, Thayer testified under oath at her deposition that she was told that she could not just order up a phone call as the jail was not a hotel and that she was told that she was lucky she was not in a prison in Iraq where she could be tortured, sodomized, and raped along with the other "rag heads and niggers." The defendants admit that Thayer did call them "racist pigs" but say they did nothing to provoke this epitaph and it was not in response to anything they said. The inference that they said something to provoke this remark must be drawn in Thayer's favor.

Then, for a reason he does not explain, Barter retrieved a pair of black leather gloves and put them on before approaching Thayer's cell. The defendants do not suggest that Barter had any reason to think that he would need to touch Thayer at this point. Reading the record in Thayer's favor, Barter did tell her that he was thin skinned and that he was going to show her what happens to people who talk back in jail.

After thirty-five seconds of verbal exchange, there is no dispute that Thayer then disobeyed Barter's order to come with him and that she backed into the cell, sat down on the bed, and refused to get up. Thayer has testified that her state of mind at this time was that she was afraid of Barter because of his preceding threats. After Barter grabbed her arm Thayer told him to leave her alone and Barter called her fat.

Supposedly it was during this juncture that Pickreign first looked at the computer to find that Thayer was a 'two unit call' -- a step that he did not take when he went by himself to move her out of the detox cell the first time -- and it was this status alone (and not any elevation of verbal dispute between Barter and Thayer) that made Barter and McCarty more cautious in dealing with Thayer. There is no dispute that as she was being pulled from the cell Thayer braced against the door frame in resistance. The video supports this representation but also supports Thayer's representation that after this action she was compliant. Nevertheless, the defendants quickly placed her forcefully up against the intake desk and implemented a forceful arm bar maneuver/compliance hold with Barter and Pickreign each holding one arm behind her back and elevating them over her head. The internal affairs memorandum indicates that "the combination of the compliance holds used by Barter and Pickreign may have contributed to the injury since there was pressure or force being applied by separate individuals at differing levels thus increasing the likelihood of injury." The defendants object to the characterization of this

hold as 'forceful' but a jury viewing the video could reasonably find that this was a forceful procedure. Reading the record in Thayer's favor, when she complained that the officers' hold was hurting her Pickreign responded that it was supposed to hurt and that when Thayer asked what they were going to do to her they replied that they were going to strip her naked and hose her down with water.

Thayer describes being pushed into the detox cell and told to kneel. There is no jail policy that requires inmates to kneel under the circumstance presented. Thayer states that she began to kneel in compliance with the order -- and the defendants concede that she was leaning forward -- yet Barter and Pickreign pushed her to the floor while Pickreign pulled up on her arm. The officers gave Thayer no warning that she was going to be pushed to the floor, let alone explained how she should kneel while her arms were being restrained behind her back. The arm Pickreign was holding was the arm that broke and Pickreign heard the bone snap. After Thayer's arm was broken and sixteen seconds after they entered the cell, Pickreign, Barter, and McCarty walked, in an orderly fashion and with no sense of urgency out of the detox cell, a mystifying attitude of nonchalance that is verified by the video provided the court. This nonchalance is also demonstrated a few seconds later when a single officer escorted medical personnel into the cell without any apparent concern that Thayer was a security threat.

I find it hard to reconcile the defendants' assertion that Pickreign and McCarty responded so avidly to the confrontational situation between Barter and Thayer because of Thayer's "potential for violence" with the factual record and video recording of the aftermath of the kneel-down procedure where it is clear that the officers left the cell with a astonishing lack of concern for Thayer's status. As to the purported self-defense and "threat of escape,"[13] -- purportedly

_____

[13]    (Pickreign Dep. at 36-37.)

premised on a policy that the use of physical force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority -- the video also reveals that a single officer escorted the two medical personnel into the cell without any identifiable special safety precautions within minutes of the alleged threat to institutional security posed by Thayer.[14]

The defendants' strategy for this challenge of demonstrating Barter's and Pickreign's entitlement to summary judgment is to attempt to parcel out the different steps of their intervention. They argue that there was no unconstitutional application of force as to all the maneuvers prior to the kneeling incident and that, as to this 'discreet' incident of the broken arm, the injury resulted from a mere failure to coordinate and not a malicious and sadistic application of force. A factfinder is not compelled to buy the defendants' argument that a failure of coordination made their definitive contact with Thayer negligent (and, thus, entitling them to summary judgment) rather than an intentional act of punishment, a key pivot point in Judge Hornby's unconstitutional force instruction in cases such as this. Trying to compartmentalize the maneuvers taken in response to Thayer in this fashion is legal dissemblance in the face of a complaint that is clearly based on an alleged sequence of events and interactions between the detainee and the officers involving an ebbing and flowing tide of conflict and eventual retribution. It remains to be seen whether or not Thayer will be able to convince a jury that her version of this tale is more credible than the defendants'. But at the summary judgment stage this court must draw all reasonable inferences in Thayer's favor.

_____

[14] And while not part of the summary judgment record, according to the complaint, jail staff refused to assist her into the vehicle (Compl. ¶ 22), an allegation that if true does not support the notion that she posed a distinct threat of violence or escape.

### a.     Qualified immunity

In undertaking a qualified immunity inquiry, this "court must decide:  (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 268-69 (1st Cir. 2009) (citing Pearson v. Callahan, 555 U.S. __, 129 S.Ct. 808, 815-16 (2009)).  As I have concluded that there is sufficient evidence to warrant a trial on the unconstitutional use of force claim against Pickreign and Barter, "the relevant question in this case … is the objective (albeit fact-specific) question whether a reasonable officer could have believed" it was lawful to apply the force "in light of clearly established law." Anderson v. Creighton, 483 U.S. 635, 641 (1987).

The defendants attempt to argue that even if this Court thinks that the application of force by these defendants was unconstitutional -- that is was inflicted with the intent to punish -- they are entitled to qualified immunity "because they did not violate a clearly established right and their actions were reasonable under the circumstances." (Mot. Summ. J. at 7.)  They reason: "While it is clearly established that force applied maliciously and sadistically to cause harm violates the Eighth Amendment, the contours of this right as it relates to this situation are not clear." (Id.)  I have concluded that there is sufficient evidence from which a jury could infer that the force applied by these two defendants was applied to a recently booked detainee with an intent to punish and I would also find a triable issue applying the malicious and sadistic Eighth Amendment standard.  I agree with the defendants that there is a potential for an entitlement to qualified immunity under the Fourth Amendment standard even though there is sufficient evidence to warrant a trial on the Saucier v. Katz-esque[15] excessive force claim in the absence of

---

[15]     533 U.S. 194 (2001).

the immunity defense.[16] However, it baffles me how a court could reach a conclusion that even though there was sufficient evidence that the force was applied impermissibly because it <u>was motivated by a desire to punish or was malicious or sadistic</u> the defendants are still entitled to summary judgment because "the contour of the right" was not sufficiently clear and objectively a reasonable officer would not have understood that applying force <u>to punish</u> contravened the clearly established law.  <u>See</u>, <u>e.g.</u>, <u>Williams v. Jackson</u>, 600 F.3d 1007, 1012 -14 (8th Cir. 2010) (Eighth Amendment unconstitutional force claim); <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1301 (11th Cir. 2002) ("In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in <u>Hudson</u> and <u>Whitley</u>.  There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation.") (citations omitted); <u>Hill v. Shelander</u>, 992 F.2d 714, 718 (7th Cir. 1993) ("The test in eighth amendment excessive force cases has been well settled for a number of years:  whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm…. As we explained above, if the finder of fact were to decide that Shelander acted with malicious intent, there could be no question that a reasonable prison sergeant should reasonably have known that the conduct described by Hill violated the eighth amendment.  That conclusion is unaffected by the fact that a prison official must balance institutional security concerns against possible harm to the inmate in taking action.")(citations and internal quotations omitted).[17]  The defendants' argument on this score comes very close to a suggestion that given

---

[16]        Such calls can be close. <u>See</u> <u>Morelli v. Webster</u>, 552 F.3d 12, 22 -25 (1st Cir. 2009).
[17]        This is clearly not a case where the injury is so limited that it is so trivial so as to not generate constitutional concerns.  <u>See</u> <u>Wilkins v. Gaddy</u>,  559 U.S. __, __, 130 S.Ct. 1175, 1178 -1180 (2010).

the misbehavior of Thayer, they thought a reasonable officer would think he or she could 'get away' with the application of a little punitive, rights-violating force.

### 2. Officer McCarty

McCarty argues he is particularly entitled to summary judgment on this record. I agree. The facts as they pertain to McCarty are nominal. McCarty was on break and returning from the restroom when Barter approached Thayer's cell. McCarty joined Barter in the cell and participated in pulling her off of the bed. While Thayer describes Barter, Pickreign, and McCarty as all participating in the forceful escort of Thayer to Room 229, I agree with the defendants that the video footage does not support Thayer's assertion that McCarty forcefully escorted her as he walked behind the Thayer, Barter, and Pickreign trio. Thayer believes McCarty grabbed the back of her shirt, but she is not sure. When Thayer was down on the floor, McCarty removed her sandals and did not check Thayer's arm; McCarty was more concerned with following procedure and taking off Thayer's shoes than he was with whether Thayer was injured. After Thayer's arm was broken, McCarty walked, in an orderly fashion, nonchalantly, and with no sense of urgency out of the detox cell.

Thayer responds to the motion for summary judgment by highlighting that McCarty admits entering Cell 225 and grabbing her by the arms to pull her off the bed. (Pl.'s Resp. Mot. Summ. J. at 10.) She also observes that McCarty considered Thayer's comments to Barter to be disrespectful. (Id.) And then there is her vague assertion that all three officers worked together to push her to the ground upon entry into the detox cell. (Id.) There is no factual footing for Thayer's assertion that McCarty participated in taunting and threatening Thayer. (Id. at 2, 7.) Although Thayer's complaint may have stated a claim against McCarty for his participation in

the events leading to her injury,[18] at this post-discovery summary judgment stage of the litigation she is calling for an unsustainable inference with respect to this defendant's liability.  See Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007).

## B.    Supervisory and Municipal Liability

With respect to the liability of Sheriff Dion and Cumberland County, Thayer's official capacity claims merge with her claim against the municipal entity.  See, e.g., Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) ("A suit against a public official in his official capacity is a suit against the governmental entity itself."); Burrell v. Hampshire Cnty, 307 F.3d 1, 7 (1st Cir. 2002) ("A damages suit against an official in an official capacity is tantamount to a suit against the entity of which the official is an agent[.]").  Thayer insists "that Sheriff Dion and Cumberland County were aware that the officers in the intake department of the jail were out of control and had a history of mistreating inmates."  (Pl.'s Resp. Mot. Summ. J. at 5.)

Thayer advances an argument that there is a custom at the jail which tolerates intake-related unconstitutional force and Cumberland County and Sheriff Dion have failed to adequately train employees on the limits on the application of force.  Both theories -- custom and policy and failure to train -- require proof of deliberate indifference.  "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Board of the County Comm'rs of Bryan Cnty v. Brown, 520 U.S. 397, 410 (1997).  "And just as proof of a custom or practice requires more than a showing of isolated acts, proof of deliberate indifference, generally requires a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional

---

[18]    Nowhere does Thayer attempt to establish or argue a failure to intervene theory of liability apropos McCarty.  See Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n. 3 (1st Cir. 1990); see also Calvi v. Knox County, 470 F.3d 422 (1st Cir. 2006)

rights.'" <u>Burge v. St. Tammany Parish</u>, 336 F.3d 363, 370 (5th Cir.2003) (quoting <u>Thompson v. Upshur County</u>, 245 F.3d 447, 459 (5th Cir.2001)). "Rather, deliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising from training that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" <u>Id.</u> (quoting <u>Thompson</u>, 245 F.3d at 459.) <u>See also</u> <u>Buchanan ex rel. Estate of Buchanan v. Maine</u>, 417 F.Supp.2d 45, 63 -71 (D.Me. 2006).

As to Cumberland County "it could be held liable under section 1983 were it to appear that the injury to [Thayer] was caused by the [County's] <u>failure to train</u> Pickreign and Barter. The liability criteria for 'failure to train' claims are exceptionally stringent, however." <u>Hayden v. Grayson</u>, 134 F.3d 449, 456 (1st Cir. 1998) (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 388-89 (1989)). "It isn't enough to 'show that there were general deficiencies in the county's training program for jailers.'" <u>Porro v. Barnes</u>, __ F.3d __, __, 2010 WL 4456990, 5 (10th Cir. Nov. 9, 2010) (quoting <u>Lopez v. LeMaster</u>, 172 F.3d 756, 760 (10th Cir.1999))." "Rather," Thayer "must 'identify a specific deficiency' that was obvious and 'closely related' to h[er] injury, so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury[.]" <u>Id.</u> (citations omitted).

Thayer notes that in his report, Chief Deputy Kevin Joyce indicated that the "double-arm bar" maneuver used by Barter and Pickreign is not one that is taught by the Cumberland County Jail, that the technique "may have contributed to the injury since there was pressure or force being applied by separate individuals at differing levels thus increasing the likelihood of injury," and that Leach testified that the use of any force when an inmate is compliant is excessive. In other words, Thayer asserts a theory of failure to train liability apropos Sheriff Dion and the

County but she also insists that both the arm-bar maneuver used and the insistence that she kneel were not official policy and that the officers were not trained to respond in this fashion.

Apropos the failure-to-train thesis, Thayer's response to the rather straight-forward, albeit less than comprehensive, facts set forth by the defendants is insufficient to warrant trial on a distinct failure to train theory. See Whitfield, 431 F.3d at 9 -13. All three officer defendants had the required basic corrections course which incorporates training on the use of force. At the time of the incident in question, Pickreign, Barter, and McCarty had been trained on the use of control, unarmed self-defense, suicide awareness and prevention, mental health issues, and Cumberland County policies and procedures, including D-241. The fact that Pickreign could not recall any specific training he had done over thirteen years on psychological disorders and suicide awareness does not create a genuine dispute material to the unconstitutional use of force inquiry.[19] "Showing that a single individual received inadequate training is insufficient for municipal liability to attach; the training program as a whole must be found faulty." Calvi v. Knox County, 470 F.3d 422, 429 (1st Cir. 2006) (citing City of Canton v. Harris, 489 U.S. 378, 390-91 (1989)). Furthermore, Thayer's allegations of the animosity and invectiveness visited upon her that night are the types of allegations of purposeful overreaching and discrimination that would be hard to thwart by "'enlightenment' training." Hayden v. Grayson, 134 F.3d 449, 457 n.14 (1st Cir. 1998).

---

[19] It could have been of some probative value if the injury complained of was linked to suicidal behavior or if Thayer's theory was that she had a psychological disorder that was a key factor in the escalation of conflict and linked Pickreign's involvement in the response to that disorder. However, on this latter point, while Thayer admits that she was agitated and that she did challenge the officers in response to the threatening comments to her -- and while her complaint alleges that she has Post-Traumatic stress disorder which was "well-known to Cumberland County Jail" due to a previous 'admission' to the jail (Compl. ¶¶ 7,8) -- she has not asserted an Eighth Amendment claim for inadequate medical care or set forth sufficient summary judgment facts to make this aspect of her state-of-mind or Pickreign's training in identifying her disorder material to her Eighth Amendment unconstitutional use of force claim.

Thayer's additional custom and policy claim against Sheriff Dion and Cumberland County is principally an argument that there was a tolerance or fostering of an environment that gave too much latitude to the officers – in a sense that they had "unfettered discretion," Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005), proximate to the intake process. That is, even if the defendant "officers were properly trained," Dion and Cumberland County left it to the "officers to make unrestricted on-the-spot determinations about how much force to employ" and this culture "superseded any training they had previously received." Id. Thayer has highlighted Leach's testimony that in the absence of any training "whatever you do is entirely appropriate." In other words, Thayer is arguing that Sheriff Dion and Cumberland County "should be held liable for this unconstitutional 'custom.'" Id.

"There are two requirements to prove a claim grounded on custom. First, the custom or practice must be attributable to the municipality," or the official decision maker for the County. Id. "That is, it must be 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" Id. (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir.1989). "Second, the custom must have been the cause of and 'the moving force behind' the constitutional violation." Id. (quoting Bordanaro v. McLeod, 871 F.2d at 1157.)

Although Thayer has done a good job of discovering prior incidents that might support her custom theory of liability, I conclude that the prior incidents are not sufficient to warrant sending the claims against Sheriff Dion and Cumberland County to trial. The Internal Affairs investigation relating to a separate matter from August 2007 informed Dion of the impression of one sergeant that the intake operations of the jail "operated freely from the supervision of the rest of the jail in just about all aspects, except for if they have an incident taking place and they

need[ed] immediate assistance."  However, this observation was not connected to an application of force and Dion testified in his deposition that he spoke to the administrator about this.  There is the August 4, 2004, report that an officer in the intake division utilized force against an inmate who had called him a "faggot"  by pushing a physically compliant inmate to the floor and taking him to his cell, after which six officers entered the cell and the inmate was then sprayed in the face with OC spray.  This incident -- which was investigated -- was more than three years prior to Thayer's arrest and detention.  Much more temporally relevant is the February 23, 2007, Chief Deputy Kevin Joyce notification that in the course of a polygraph test taken by a corrections officer, the officer admitted that, on several occasions he had both witnessed verbal and physical abuse of inmates by corrections officers and had engaged in that behavior himself.  This officer stated that he had seen other corrections officers verbally abuse or provoke inmates in order to provoke an altercation and stated that he had seen other corrections officers use excessive force against inmates or force that was disproportionate to what the situation called for.  What the officer admitted in a polygraph test is obviously hearsay however this was information of which Sheriff Dion was apprised.  It is unclear what the timeframe is for the conduct described by the officer.

Most probative of all is the June 2007 internal investigation triggered by a review of a video from the intake area of the jail taken on June 25, 2007, just over two months prior to Thayer's detention.  According to that report both McCarty and Barter were present and assisted in moving an inmate to the detox cell on June 25.  The investigator noted his concern that McCarty's report of the incident is so similar to the other officers' reports that they could have been written by the same person.  This report ultimately substantiated the allegation that the

officer being investigated had used excessive force when he bent an inmate over a counter in the intake section of the jail and bounced his head off the Plexiglas window two times.

Thayer's own attempted showing on her unconstitutional custom theory demonstrates the investigation of this particular encounter between the officers and Thayer and the prior investigations into incidents that Thayer thinks are probative of her claim. Whitefield, 431 F.3d at 13. There is no evidence of disciplinary charges being filed as a consequence of the investigation of this incident but "[s]tanding alone, the lack of any disciplinary charges" against the officers involved "is not probative of a 'well settled and widespread' policy or custom" nor does it carry Thayer further in her quest to establish deliberate indifference on the part of Sheriff Dion or Cumberland County. Id. at 13-14. See also Woods v. York County, 534 F.Supp.2d 153, 159 -160 (D. Me. 2008). The isolated incidents that Thayer has carefully chronicled were all subject to investigation by the policymakers at the jail. The record does not support the inference that the County or the Sheriff had a custom or policy of allowing physical punishment of detainees during the intake process. In fact, the most probative incident, the June 2007 incident involving the officer banging the detainee's head against the plexiglass, was decidedly not the institution's custom or policy. A supervising officer initiated the investigation of the incident, leading to the substantiation of the use of excessive force, contrary to the jail's policy.

Finally, Thayer does not make it crystal clear that she has a distinct individual capacity suit against Sheriff Dion for failure to supervise in responding to the motion for summary judgment. Certainly there is no indication that he had any direct, temporally proximate supervisory responsibility over the other individual defendants who caused the injury. See Ashcroft v. Iqbal, 556 U.S. __, __, 129 S. Ct. 1937, 1947 -49 (2009); Whitfield, 431 F.3d at 14. Assuming supervisory liability still is a tenable liability standard in the wake of Iqbal, see

Santana-Castro v. Toledo-Davila. 579 F.3d 109, 116 n.5 (1st Cir. 2009); Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009); see also Morris v. Ley, No. 08-2459, 2009 WL 1784081, 3 (7th Cir. June 24, 2009), clearly mere knowledge of a subordinate's wrongful conduct does not establish 42 U.S.C. § 1983 liability for a supervisor.  Rather, there must be an affirmative link between the conduct of the supervisor and the constitutional deprivation experienced by Thayer. See Sanchez v. Pereira-Castillo, 590 F.3d. 31, 49 (1st Cir.2009); Maldonado, 568 F.3d at 274-75.

## C.    State Law Claims

The defendants have not briefed the merits of Thayer's state law tort claims against the three officer defendants but have only asserted that they are entitled to discretionary immunity under 14 M.R.S. § 8111(1)(c).  In response, Thayer argues that these defendants are not entitled to invoke the 14 M.R.S. § 8111(1) shield at the summary judgment stage if there is a triable claim of unconstitutional use of force.  She does not attempt to defend the substantive merits of the tort claims against any of the officer defendants in the event that the Court concludes that there is no constitutional claim worthy of trial against one or more of the defendants.  In her response to the motion for summary judgment Thayer does not defend state tort claims against Sheriff Dion or Cumberland County.  In their reply the defendants do not revisit the tort claim liability argument.  Therefore, I proceed to analyze only the discretionary function immunity issue as it relates to Barter and Pickreign; Sheriff Dion, Cumberland County, and McCarty are entitled to summary judgment on Thayer's state law claims.[20]

---

[20]    The summary judgment facts that pertain to the Maine Tort Claims Act are as follow. The Maine County Commissioners Association Self-Funded Risk Management Pool (Risk Pool) is a public self-funded pool established pursuant to 30-A M.R.S.A. ch. 117. (SMF ¶ 60; Resp. SMF ¶ 60.) Cumberland County is a Named Member of the Risk Pool and is provided with insurance-type coverage pursuant to a document entitled "Maine County Commissioners Association Self-Funded Risk Management Pool Coverage Document" ("Coverage Document"). (SMF ¶ 61; Resp. SMF ¶ 61.) The Coverage Document specifically excludes any coverage for any cause of action seeking tort damages for which the County is immune pursuant to the Tort Claims Act, and limits coverage to those areas for which governmental immunity is expressly waived by the Tort Claims Act. (SMF ¶ 62; Resp. SMF ¶ 62.)

There have been many opportunities for judges in this district to address the interrelation between claims of unconstitutional use of force and supplemental tort claims when discretionary immunity is a concern as to the latter. In the excessive force by police officers situation the use of force by a police officer is a discretionary act. Comfort v. Town of Pittsfield, 924 F.Supp. 1219, 1236 (D.Me.1996). However, the immunity under the Maine Tort Claims Act does not apply when police officers "act in a manner so egregious as to clearly exceed, as a matter of law, the scope of any discretion they could have possessed in their official capacity as police officers." Id. (citation and internal punctuation omitted). That is, when a plaintiff has a claim that the defendant violated his constitutional right to be free from excessive force worthy of a trial, there is a trialworthy issue that the defendant exceeded the scope of his or her discretion for purpose of state tort discretionary immunity. See also Parlin v. Cumberland County, 659 F. Supp. 2d 201, 214 (D. Me. 2009); Fortin v. Town of Wells, Civ. No. 09-179-P-S, 2010 WL 1935750, 5 (D.Me. May 11, 2010) (unpublished).

## D. Punitive Damages

The final concern is whether or not Thayer is entitled to seek punitive damages on her claims against Barter and Pickreign. Thayer concedes that she cannot recover punitive damages on her claims against Sheriff Dion and Cumberland County. The defendants argue: "To the extent summary judgment is granted on the above claims, summary judgment should be granted on this claim. Furthermore there is no evidence that the individual Defendants acted with the necessary state of mind required for the imposition of punitive damages." (Mot. Summ. J. at 18.)

In light of the forgoing analysis, it should come as no surprise that I disagree with the

---

Other than the insurance-type coverage provided to Cumberland County under the Risk Pool's Coverage Document, Cumberland County has not procured insurance against liability for any claim against the County or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act. (SMF ¶ 62; Resp. SMF ¶ 62.)

defendants that Thayer should not be able to attempt to persuade a jury of her entitlement to

punitive damages as against Barter and Pickreign.  As Judge Singal recently summarized in

Fortin v. Town of Wells, a case alleging excessive force by officers during an arrest:

> To recover punitive damages … under section 1983, Plaintiff must show that these officers acted with reckless or callous disregard for his rights or that they intentionally violated federal law. See Smith v. Wade, 461 U.S. 30, 49-51 (1983). In addition, for the Court to award Plaintiff punitive damages on his Maine Civil Rights Act claim, he must show that the officers acted with malice. See Comfort v. Town of Pittsfield, 924 F.Supp. 1219, 1238 (D.Me.1996); McAlister v. Slosberg, 658 A.2d 658, 660 (Me.1995).

2:09-cv-00179-JHR, 2010 WL 1935750, 6 (D. Me. May 11, 2010) (unpublished decision).  As

was the case in Fortin at the summary judgment phase, on this record before me a reasonable

juror could find that Barter and Pickreign acted with reckless or callous disregard for Thayer's

right to be free from the unconstitutional use of force or that they acted with malice.  See id.[21]

---

[21] Judge Hornby's pattern instruction for punitive damages in excessive force cases is as follows:

     If you have awarded compensatory or nominal damages, you may also award punitive damages to [plaintiff] under some circumstances. To obtain punitive damages, [plaintiff] must prove by a preponderance of the evidence that [defendant] either knew that [his/her] actions violated federal law or acted in reckless or callous indifference to that risk. If [plaintiff] satisfies this requirement, it is entirely up to you whether or not to award punitive damages. But it should be presumed that [plaintiff] has been made whole by compensatory damages, so you should award punitive damages only if [defendant's] culpability is so reprehensible as to warrant further sanctions to achieve punishment or deterrence.

     If you decide to award punitive damages, the amount to be awarded is also within your sound discretion. The purpose of a punitive damage award is to punish a defendant or deter a defendant and others from similar conduct in the future. Factors you may consider include, but are not limited to, the nature of [defendant's] conduct (how reprehensible or blameworthy was it), the impact of that conduct on [plaintiff], the ratio between the actual compensatory damages and the punitive damages, the relationship between [plaintiff] and [defendant], the likelihood that [defendant] or others would repeat the conduct if the punitive award is not made, and any other circumstances shown by the evidence, including any mitigating or extenuating circumstances that bear on the question of the size of such an award. You may determine reprehensibility by considering the nature and extent of the harm; whether the conduct showed indifference to or disregard for the health or safety of others; whether the conduct involved repeated actions or was an isolated instance; and whether the harm was the result of intentional malice.

Dist. Me. Pattern Jury Inst. 7.1 (Hornby, J.) (updated Mar. 9, 2007) at 24 (footnotes omitted).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

November 30, 2010